UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR-06-91-B-W |
| | ) | |
| JOHN RICHARD WIXON, | ) | |
| | ) | |
| Defendant. | ) | |

**SENTENCING ORDER**

While rejecting John Richard Wixon's argument that he possessed the firearms he stole for collection, the Court accepts his argument that he possessed them for lawful sporting purposes and will apply the sporting purpose reduction under U.S.S.G. § 2K2.1(b)(2).

**I. BACKGROUND**

In November and December 2005, John Wixon stole firearms from his then employer, Willey's Sports Center, in Ellsworth, Maine. On December 18, 2006, Mr. Wixon pleaded guilty to an Information charging him with theft of firearms from a federally licensed firearms dealer, in violation of 18 U.S.C. § 922(u). The amended prosecution version confirms the theft of nine firearms:

1) High Standard Supermatic Citation .22 caliber pistol, serial number ML39569;

2) Ruger 10/22 .22 caliber rifle, serial number 25617749;

3) Savage Model 93 .17 HMR rifle, serial number 0523531;

4) American Derringer Model DA .38 caliber pistol, serial number 43201;

5) Remington 700 .338WM caliber rifle, serial number B6871405;

6) HK USP Smith & Wesson .40 caliber pistol, serial number 26-074384;

7) Smith & Wesson M-610 10 mm revolver, serial number CCR0473;

  8) Beretta 85F .380 caliber pistol, serial number F2900614; and,

  9) Ruger M77 7 mm rifle, serial number 791-52815.

The Presentence Investigation Report (PSR) dated March 8, 2007 calculated Mr. Wixon's guideline sentence as follows: 1) a base offense level of 12 under U.S.S.G. § 2K2.1(a)(7); 2) a four-level enhancement under U.S.S.G. § 2K2.1(b)(1)(B) because the offense involved more than 8 firearms, but less than 24; and, 3) a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1 for a total offense level of 13. Mr. Wixon has no criminal record and, therefore, falls in Criminal History Category I. For a total offense level of 13 and a Criminal History Category I, the guideline sentencing range is 12 to 18 months.[1]

  Mr. Wixon objected to the PSR on a number of bases: 1) that he is entitled to a reduction for possessing the firearms for lawful sporting or collection purposes under U.S.S.G. § 2K2.1(b)(2); 2) that he is entitled to an aberrant behavior downward departure under U.S.S.G. § 5K2.20; 3) that he is entitled to a post-offense rehabilitation downward departure under U.S.S.G. § 5K2.0; and, 4) that he is entitled to a non-guideline, statutory sentence under 18 U.S.C. § 3553(a). To establish the evidentiary predicate for these positions, Mr. Wixon presented testimony at a hearing on May 23, 2007; the parties subsequently submitted memoranda. The Court will summarize the evidence applicable to each issue.

## II. THE EVIDENCE

### A. Testimony of Charles Kravitt

  Christopher Kravitt, a federally-licensed firearms dealer, testified as a defense expert on whether the firearms were collectible. Mr. Kravitt reviewed each firearm:

---

[1] In addition, Mr. Wixon would be ineligible for probation and subject to a period of supervised release from 2 to 3 years, a fine of between $3,000 and $30,000, and a special assessment of $100.00. Finally, he is subject to a restitution order for the diminished value of the firearms.

      1)  <u>High Standard Supermatic Citation .22 Pistol:  Collectible</u>

Mr. Kravitt testified that this firearm is "definitely collectible."

      2)  <u>Ruger 10/22 .22 Caliber Rifle:  Collectible</u>

Mr. Kravitt testified that, generally speaking, a Ruger 10/22 .22 caliber rifle would not be considered a collector's item; in this case, however, the firearm was a 25th anniversary edition. Mr. Kravitt said the firearm would be more of a collectible if unfired and retained in its original box, but expressed the opinion that this Ruger would be considered collectible.[2]

      3)  <u>Savage Model 93 .17 HMR Rifle:  Not Collectible</u>

Mr. Kravitt testified that this firearm is a brand-new model, which made a "big splash" in the firearms industry.  Nevertheless, he said that although it is "conceivable" that someone would purchase it, keep it unfired, and collect it, he concluded it is a "toss-up" and could not say it is a collectible firearm.

      4)  <u>American Derringer Model DA .38 Caliber Pistol:  Not Collectible</u>

This Derringer is used in cowboy action shooting, the fastest growing shooting sport in the United States.  But, Mr. Kravitt conceded that to call this firearm a collectible would be a "stretch."

      5)  <u>Remington 700 .338WM Caliber Rifle:  Collectible</u>

Although Mr. Kravitt's testimony on this firearm was somewhat equivocal, he said that the firearm does not have the most common caliber and is a desirable sporting rifle.  He noted that the rifle has its original custom stock, which lends it to being a collector's piece.

      6)  <u>HK USP Smith & Wesson .40 Caliber Pistol: Collectible</u>

Mr. Kravitt testified that this firearm is collectible.  This firearm has a limited edition frame, which increases its desirability.

---

[2] Mr. Wixon later testified that he had used the firearm for target practice.

3

    7)  <u>Smith & Wesson M-610 10 MM Revolver:  Collectible</u>

Mr. Kravitt said that this firearm is definitely collectible.  Smith & Wesson made only a few and they are very sought after by collectors.

    8)  <u>Beretta 85F .380 Caliber Pistol:  Not Collectible</u>

Mr. Kravitt said he could not consider this firearm to be a collectible.

    9)  <u>Ruger M77 7 MM Rifle:  Not Collectible</u>

Mr. Kravitt said that he really does not see this firearm as being a collectible.  He observed that there is a Ruger Collectors Association and some people might collect firearms that others would not.  However, he did not classify this firearm as a collectible.

To summarize, Mr. Kravitt identified five of the nine firearms as either definitely or potentially collectible; the remaining four were not collectible.

Mr. Kravitt made several additional points.  First, Mr. Kravitt stated that with commemorative firearms, collectors will "keep them unfired, in the box, with all the original paperwork."  He conceded that use of a commemorative firearm will reduce its desirability.  He made a similar point about the Supermatic Citation .22 pistol; namely, that he has a customer with a large collection, many of which "he never fires."  Second, he acknowledged that the fact that the firearms were stolen would have a significant impact on their value as collectors' items, since the purchaser would have to be willing to receive stolen property.  For six firearms, however, Mr. Wixon completed the ATF paperwork and received a NICS approval number of the transaction and it would have been difficult for the firearms to have been traced as stolen.  Finally, he conceded that none of the firearms meets the statutory and regulatory definition of "curios or relics."  *See* 18 U.S.C. § 921(a)(13); 27 C.F.R. § 478.11.

### B.  Testimony of John Wixon

Mr. Wixon also testified.  He said he has always loved firearms and began using them as young as three years old.  Although his family never hunted with firearms and he has never used a firearm to hunt, he has engaged in target practice ever since he was a boy.  Mr. Wixon served in the United States Army and received basic instruction on the handling and care of firearms.  After the military, he was ultimately hired by Willey's, initially in sales up front.  Later, he moved to the gun store in the back, where he began mounting scopes, changing sights, doing basic bore sighting, slings, and other similar work.  Before working for Willey's, Mr. Wixon owned six firearms, both handguns and long guns.  He used these guns to do "pitch shooting," otherwise known as "plinking."

Mr. Wixon stated that he has always been interested in gun mechanisms.  He liked to "compare one gentleman's creation, like a Ruger compared to a Smith & Wesson compared to a Colt."  He developed the avocation of disassembling and reassembling firearms at home.[3]  Mr. Wixon testified that he did not take the firearms to later sell them.  To the contrary, he had "purchased a firearm safe and was just going to hang onto them."

Mr. Wixon addressed why he took each firearm:

1) <u>High Standard Supermatic Citation .22 Caliber Pistol</u>

Mr. Wixon said that this was the same model gun that his grandfather, who was a professional target shooter, had given to him.  Mr. Wixon later traded the firearm and after he traded it, he felt it "left a little hole there that I – I wanted to fill."  He explained that "I wish I hadn't ever have gotten rid of my grandfather's because I never had the opportunity to meet

---

[3] His wife Katie Wixon confirmed this testimony.  She stated that "every single night I'd come home from work and Johnny would have out his – the table would just be full, and he would be taking them apart and cleaning them and figuring out how the disassemblement worked."

him."  This particular firearm had "custom, walnut grips with a place for your thumb like a thumb rest, useful in stabilizing for target shooting."

    2)  Ruger 10/22 .22 Caliber Rifle

Mr. Wixon said that this rifle was like his "first .22."  He described it as "small, light, inexpensive to target shoot."  He testified that "[y]ou can buy a brick of .22 ammunition for 10 [or] 11 dollars, and have a couple hours of fun."  Although the gun was "very attractive," he used it for target shooting, probably a hundred yards or less, paper."

    3)  Savage Model 93 .17 HMR Rifle

Mr. Wixon said that he had "not shot a .17 HMR," which he described as a "new caliber."  He described the firearm as having "a black, synthetic stock and a stainless steel, bull barrel, which is for improved accuracy in targeting shooting.  It has less flex."

    4)  American Derringer Model DA .38 Caliber Pistol

Mr. Wixon testified that the American Derringer was "the first one I had ever seen personally."  It was "stainless steel" with "multicolored wooden grips and a real stiff trigger that I thought if I could get comfortable with shooting that at a target, that it would improve my – my trigger pull on the other models, as well, because it was a hard, double-action trigger."

He recalled the man who had brought the Derringer into Willey's.  Mr. Wixon said he asked him "a lot of questions about his collecting and the Derringer line."  He learned about the Blue Hill Gun Club and the fact that it puts on cowboy action shoots frequently.  He actually filled in a couple of applications and had intended to use the Derringer at the cowboy shoots.  He shot the Derringer the first day he got it.

5) <u>Remington 700 .338WM Caliber Rifle</u>

Mr. Wixon described this firearm as a long gun that "can be used on any game in North America." He thought "that would cover any future interest in hunting, whether it be a deer size or possibly larger, like a moose or a bear or anything along those lines." He never actually used the Remington.

6) <u>HK USP Smith & Wesson .40 Caliber Pistol</u>

The HK was "a coyote brown, polymer frame." It was "kind of the color of the Army desert camo [which is] my favorite color." He said that .40 caliber is his "favorite caliber . . . kind of a compromise between power and speed." He used the firearm to target shoot paper at 25 yards.

7) <u>Smith & Wesson M-610 10 MM Revolver</u>

Mr. Wixon said the Smith & Wesson 610 is "both a 10 millimeter, which is kind of a rare cartridge, and it was also a .40 caliber. It could shoot both." He reiterated that "the .40 caliber was one of my favorites." The firearm had Hogue grips – a type of popular rubber grips – and came with a moon clip to hold the cartridge in the firearm. He used that revolver for target shooting.

8) <u>Beretta 85F .380 Caliber Pistol</u>

At some other time, he had purchased a Beretta 84, which is "virtually the exact, same model, only with a – a staggered magazine, which means that the cartridges are not one on top of each other. They're offset, and so that creates a wider grip, and so the 85 had a single stack, which was a thinner grip, so essentially it was like a twin, and I liked the 84 with a thick grip,

and I thought that my wife might be able to handle the – the thinner, smaller one." He never used the gun.

      9) <u>Ruger M77 7 MM Rifle</u>

Mr. Wixon said that the gun is experiencing "kind of a new surge in popularity." This firearm was "a lightweight model." It is "a little bit slimmer and shorter, both in the stock and in the barrel." He explained that he had been in a car accident the year before and had injured his right arm. He "thought that that might be a rifle that I could actually hunt with as far as, you know lugging it and – and being able to pull it up after carrying it for multiple hours." He never actually used the rifle.

    **C.  Testimony of Katie Wixon**

Katie Wixon, John Wixon's wife, also testified. She said that she is a shooter and would occasionally accompany her husband to a sand pit or firing range. Each would shoot the guns to "see how they felt." When they went out together, her husband would "let me shoot the smaller guns." She testified that the Derringer "was my gun – well it was the one that he had found for me because it was so small." She said that actually her husband "let me try them all, but a lot of them had back-fire and I couldn't really hold on to." She said her husband "doesn't like to kill" and has never gone hunting. She confirmed his fascination with disassembling and reassembling guns.

## III. DISCUSSION

    **A. The Lawful Sporting Purposes or Collection Reduction:  U.S.S.G. § 2K2.1(b)(2)**

Section 2K2.1(b)(2) provides for a reduction to offense level 6 if the defendant possessed the firearms for lawful sporting purposes or collection:

> If the defendant, other than a defendant subject to subsection (a)(1), (a)(2), (a)(3), (a)(4), or (a)(5), possessed all ammunition and

>     firearms solely for lawful sporting purposes or collection, and did
>     not unlawfully discharge or otherwise unlawfully use such firearms
>     or ammunition, decrease the offense level determined above to
>     level 6.

U.S.S.G. § 2K2.1(b)(2). In applying § 2K2.1(b)(2), the guideline commentary enumerates several relevant factors, including "the number and type of firearms, the amount and type of the ammunition, the location and circumstances of possession and actual use, the nature of the defendant's criminal history (e.g., prior convictions for offenses involving firearms), and the extent to which possession was restricted by local law." U.S.S.G. § 2K2.1 *App. Note* 6. Because it benefits the Defendant, Mr. Wixon bears the burden "to prove, by a preponderance of the evidence, that he [is] entitled to [the] reduction." *United States v. Denis*, 297 F.3d 25, 32 (1st Cir. 2002); *United States v. Cousens*, 942 F.2d 800, 802 (1st Cir. 1991). Mr. Wixon's position is that he is entitled to the collection reduction for many of the firearms and is entitled to the lawful sporting use reduction for the remainder.

### 1. Lawful Collection

#### a. Overview

Section 2K2.1(b)(2) seems to establish a bifurcated test, asking: (1) why the defendant possessed the firearm – "possessed solely for lawful . . . collection;" and, (2) whether the firearm was lawfully collectible – "lawful . . . collection." For the first criterion to apply, the defendant must establish that he came into possession of the firearm in order to collect it. If he came into and retained possession of the firearm for reasons other than collection, he is not entitled to the reduction. For the second criterion to apply, the defendant must establish that the firearm was

lawfully collectible.[4] If he intended to possess the firearm for collection, but the firearm was not objectively collectible, he is not entitled to the reduction.

### b. A Striking Dissonance

There is a striking dissonance between Mr. Kravitt's testimony and Mr. Wixon's testimony. Mr. Kravitt explained that whether the firearms were collectible focused on more objective characteristics, such as quality, rarity or uniqueness; Mr. Wixon's description of why he took the firearms, how he intended to use them, and how he did use them had virtually nothing to do with the qualities identified by Mr. Kravitt. For example, although Mr. Kravitt opined that the High Standard Supermatic is "definitely collectible," Mr. Wixon did not mention that he took it for its value as a collector's item. He testified he wanted the firearm because it was the same model that his grandfather had given him and he wanted to possess the same type of firearm to fill the "little hole" left by trading his grandfather's gun.

Similarly, even though Mr. Kravitt said that the Ruger 10/22 .22, the Remington 700, the HK USP Smith & Wesson, and the 10 mm Smith & Wesson were collectible, Mr. Wixon never asserted that he wanted these firearms to collect them for the intrinsic values identified by Mr. Kravitt. Nor did Mr. Wixon retain these guns as a typical collector might, that is, in mint condition, unfired, and in their original boxes. Instead, he used the Ruger 10/22 .22, the HK USP Smith & Wesson, and the 10 mm Smith & Wesson for target practice, even though, in doing so, he likely decreased their value as collectibles. He testified that he took the Ruger because it was inexpensive to use for target practice and thought it was attractive, not because of

---

[4] Under this analysis, there are four possibilities: (1) that the defendant intended to possess the firearm to collect it and the firearm was collectible; (2) that the defendant did not intend to possess the firearm to collect it and the firearm was not collectible; (3) that the defendant intended to possess the firearm to collect it, but it was not collectible; and, (4) that the defendant did not intend to possess the firearm to collect it, but it was collectible. The only possibility that allows for the reduction is number one: his motive for possession and the collectible nature of the firearm must mesh. Otherwise, he will not have possessed the firearm solely for lawful collection as § 2K2.1(b)(2) requires.

its value as a collectible object. He took the Smith & Wessons because he liked the color or the grip, and he ended up using both for target shooting. Although he never actually used the Remington, he testified that he wanted the long gun, because he would be able to use it for hunting, if he ever chose to do so.

Mr. Wixon's own testimony was that he took each of the guns for his own purposes – to hang onto them, to target practice with them, and perhaps, to hunt with one of them. He had no desire to resell the firearms and, indeed, there is a limited resale market for stolen guns. He used collectible firearms just as he used non-collectible firearms.

### c. Subjective Collection

It is the Court's view that Mr. Wixon stole the firearms simply because he wanted them. Mr. Wixon is a bright young man with an aptitude for engineering and he became fascinated by the way guns are designed and the variation in mechanisms. He generally liked firearms and liked some more than others. If he really liked one, he took it. Perhaps he took it because it had an interesting grip, because it reminded him of his grandfather, because he thought his wife would enjoy target shooting with it, and so on, but not for reasons related to the gun's value as a collector's item. It is true that people can collect virtually anything, from bottle caps to hotel soap. But, to infuse the concept of collection as used in the guidelines with a vague sense of accumulation stretches the term beyond the breaking point, allowing the subjective reasons for accumulation to trump the guidelines' use of the term.

No First Circuit cases directly address this issue. The closest circuit case is *United States v. Andrews*, No. 94-5109, 1994 U.S. App. LEXIS 36707 (4th Cir. Dec. 29, 2004). In *Andrews*, the Fourth Circuit addressed a situation where a defendant amassed 109 firearms, which were "displayed in an orderly fashion on the floor in Andrews' den." *Id.* at *2. The circuit court

11

upheld the district court's denial of the collection reduction, saying: "Although Andrews possessed a large number of guns that were unloaded and on display in his den, they generally were common shotguns and rifles typically not 'collected' in the narrow sense of being 'collector's items.'" *Id.* at *12. *Andrews* noted that the district court described the defendant's possession as an "unlawful 'accumulation' not meriting the reduction." *Id.* at *11; *see United States v. Clingan*, 254 F.3d 624, 626 (6th Cir. 2001) (upholding the denial of the collection reduction, and noting that "[n]one of the weapons were antiques or of other special value."). Courts have rejected arguments for a § 2K2.1 collection reduction for an eccentric collection of sawed-off shotguns. *See United States v. Kirk*, 894 F.2d 1162, 1164 (10th Cir. 1990) (stating that "sawed-off shotguns are not ordinarily considered collectibles . . . ."); *United States v. Cratty*, 703 F. Supp. 62, 63 (D. Idaho 1988). The Court concludes that Mr. Wixon did not possess the firearms for collection within the meaning of U.S.S.G. § 2K2.1(b)(2).

### 2. Sporting Purpose

Mr. Wixon has another arrow in his quiver. He argues that, even if he did not possess all of the firearms for collection purposes, he possessed them for lawful sporting purposes and did not unlawfully discharge or otherwise unlawfully use them. In the Court's view, he has demonstrated that he never unlawfully discharged or otherwise used the firearms; the sole question is whether his possession of the firearms was possession for "lawful sporting purposes."

It is at least counterintuitive that the possession of a stolen firearm, particularly one that the defendant himself stole, could be possession for a lawful sporting purpose. It is, of course, against the law to retain stolen property, *see* 17-A M.R.S.A. § 359(1)(A); hence, it would seem incongruous for a person to lawfully target shoot with a weapon he cannot lawfully possess.

Nevertheless, "the guidelines sometimes define terms in ways that might strike lay persons as peculiar." *United States v. Reccko*, 151 F.3d 29, 31 (1st Cir. 1998).

Here, the argument runs that the provisions within § 2K2.1 are only relevant when a defendant has done an illegal act involving a firearm or ammunition; yet, the guidelines specifically make the sporting purpose reduction unavailable for certain of those defendants and not for others. For example, § 2K2.1 provides the guideline calculations for defendants convicted of possession of a firearm by a felon; Section 2K2.1(a)(1) carves out a number of firearms offenses for which the sporting purpose reduction is categorically unavailable, such as the possession of a semiautomatic firearm capable of accepting a large capacity magazine. *See* U.S.S.G. § 2K2.1(a)(1); §2K2.1(b)(2). Thus, if the guidelines do not expressly bar the sporting purpose reduction, it must be theoretically available.

As it turns out, stealing a firearm from a federally-licensed dealer is not one of those enumerated crimes under § 2K2.1(b)(2) for which the sporting purpose reduction is expressly unavailable. If a person who is already a felon and who illegally possesses a firearm can receive a sporting purpose reduction, it is not a far leap to conclude that a person who is not yet a felon and steals a firearm can also obtain the same benefit. In *United States v. Lemieux*, 462 F. Supp. 2d 78 (D. Me. 2006), this Court considered a similar argument and concluded that the sporting purpose reduction was available to a defendant whose terms of probation prevented his possession of a firearm. In *Lemieux*, this Court concluded that § 2K2.1(b)(2) "is unavailable to the more culpable and, by implication, available to the less culpable." *Id.* at 84. Here, even though Mr. Wixon's decision to repeatedly steal firearms from his own federally-licensed employer is wholly blameworthy and criminal, Mr. Wixon's offense by itself does not prohibit application of the sporting purpose reduction.

13

There is no First Circuit law directly on point. The two circuits which have addressed the question have arrived at different conclusions. In *Andrews*, the Fourth Circuit noted that a defendant convicted of receiving stolen firearms under 18 U.S.C. § 922(j) would be prohibited from possessing the weapons under state law and, therefore, "the fact that they were stolen and their possession was restricted by state law disqualifies Andrews from the reduction as a matter of law." *Andrews*, 1994 U.S. App. LEXIS 36707, at *12. By contrast, in *United States v. Leonard*, the Sixth Circuit pointed out that the guideline commentary directed the court to consider the "surrounding circumstances," including "the location and circumstances of possession and actual use." 97 Fed. Appx. 599, 602-03 (6th Cir. 2004). *Leonard* concluded that "a district court [may] consider the means by which defendants come to possess firearms in determining whether they have met their burden of showing that they possessed them solely for lawful collection and sporting purposes[.]" *Id.* at 604. *Leonard* observed, however, that "[d]efendants who steal a firearm . . . understandably face a more difficult burden in showing that they possessed the gun solely for legal purposes." *Id.* at 603.

In the Court's view, *Leonard* is better reasoned. If the guidelines intended to include theft of a firearm within those crimes for which the sporting purpose reduction would be categorically unavailable, they could have said so. Instead, in determining whether the possession was for lawful sporting purposes, the guidelines have directed the sentencing courts to take into consideration the circumstances under which the defendant came to be in possession. As *Leonard* noted, the defendant who steals a firearm bears an onerous burden to demonstrate that his possession was solely for lawful sporting purposes, but the reduction is not categorically forbidden. Thus, the Court reviews the circumstances surrounding Mr. Wixon's acquisition of the firearms, as directed by the guidelines.

1) <u>Number and type of firearms</u>

Here, the defendant took nine firearms, each of which was usable for sporting purposes, either target shooting or hunting. The guns were not at the extremes: they were neither cheap, easily-concealed, inaccurate handguns nor powerful, semi-automatic rifles with a large capacity magazine. Instead, they were firearms that a gun enthusiast, like Mr. Wixon, would use for sporting purposes.

2) <u>The amount and type of ammunition</u>

There is no evidence about ammunition, except oblique references to the caliber of some of the firearms and Mr. Wixon's testimony that he selected certain firearms because he knew the ammunition was inexpensive.

3) <u>The location and circumstances of possession and actual use</u>

Mr. Wixon came into possession of each firearm by stealing it from his employer. As *Leonard* observed, if a person comes into possession of a firearm illegally, he bears a special burden to demonstrate that his possession and use was for lawful sporting purposes. With this said, there is nothing about Mr. Wixon's possession of the firearms that suggests he possessed or used any of them for illegal activity. Mr. Wixon purchased a firearms safe, where he retained the firearms. There is direct or inferential evidence that Mr. Wixon himself went target shooting with seven firearms. Regarding the remaining two firearms – the Remington and Ruger M77 7 mm rifle – Mr. Wixon testified that he had not used them for target shooting, but had stolen them to use as hunting weapons. This testimony is somewhat contradicted by his testimony that neither he nor his family ever hunted, and by his wife's testimony that she had never known him to hunt because "he doesn't like to kill." On the other hand, while working at Willey's, he became interested in hunting simply by listening to its customers discussing their hunting

15

experiences. By his testimony, which the Court accepts, it appears that Mr. Wixon was contemplating hunting and this motivated his theft of these rifles.

    4) <u>The nature of the Defendant's criminal history</u>

Mr. Wixon has no criminal history.

    5) <u>The extent to which possession was restricted by local law</u>

This is factor is ambiguous. If by "local law," the guidelines mean municipal ordinance, there is no evidence that the town of Surry, where Mr. Wixon lived at the time, restricts the possession of firearms. If by "local law," the guidelines mean state law, his possession of a stolen firearm would constitute a state criminal act. It appears, however, that phrase is intended to refer to the former, not the latter. *See United States v. Bossinger*, 12 F.3d 28, 30 (3d Cir. 1993) ("We hold, therefore, that a firearm possessed solely for lawful sporting purposes includes a firearm possessed solely for plinking in a manner lawful in the location where the plinking is conducted.").

Applying these various factors to Mr. Wixon's possession of the firearms, the Court concludes that he possessed the firearms solely for target practice and hunting, both of which are lawful sporting purposes under the guidelines.[5]

## IV. CONCLUSION

The Court concludes that John Richard Wixon has sustained his burden of proof to demonstrate that he possessed each of the firearms he stole for a lawful sporting purpose and that

---

[5] Mr. Wixon's fascination with the mechanical aspects of the various firearms and his persistent disassembly and reassembly of them does not in the Court's view take him outside the sporting purpose anymore than a car racer's constant fiddling with his engine would be considered separate from the sport of car racing.

16

he did not unlawfully discharge or otherwise unlawfully use the firearms. The Court will apply the sporting purpose reduction under U.S.S.G. § 2K2.1(b)(2).[6]

    SO ORDERED.

                                                      /s/ John A. Woodcock, Jr.
                                                      JOHN A. WOODCOCK, JR.
                                                      UNITED STATES DISTRICT JUDGE

Dated this 9th day of August, 2007

---

[6] Based on this conclusion, the Court does not reach the remaining issues: 1) whether he is entitled to an aberrant behavior downward departure under U.S.S.G. § 5K2.20; 2) whether he is entitled to a post-offense rehabilitation downward departure under U.S.S.G. § 5K2.0; and, 3) whether he is entitled to a non-guideline, statutory sentence under 18 U.S.C. § 3553(a).